**SO ORDERED.**

**SIGNED this 8th day of December, 2017.**

_____
BENJAMIN A. KAHN
UNITED STATES BANKRUPTCY JUDGE

---

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

In re:                          )
                                )
Ronald Arthur Woody,            )       Case No. 17-10443
                                )
            Debtor.             )       Chapter 7
_____ )

### MEMORANDUM OPINION GRANTING MOTION TO DISMISS

This case came before the Court for hearing on October 10, 2017, on the Motion to Dismiss Proceeding or Convert to Chapter 11 [Doc. #74] ("Motion to Dismiss") filed by Wells Fargo Advisors, LLC ("WFA") on September 8, 2017. At the hearing Charles M. Ivey, III appeared on behalf of Ronald Woody ("Debtor"), Paul J. Puryear and William H. Kroll appeared on behalf of WFA, and Everett B. Saslow appeared as Trustee. For the reasons set forth herein, the Motion to Dismiss will be granted.

### I.   Procedural and Factual Background

Debtor commenced this case by filing the Chapter 7 Voluntary Petition [Doc. #1] ("Petition") on April 12, 2017 (the

1

"Petition Date"). WFA filed the Motion to Dismiss on September 8, 2017, and Debtor filed the Response [Doc. #78] ("Debtor's Response") on September 21, 2017. WFA filed its Reply in Support of the Motion to Dismiss [Doc. #80] ("WFA's Reply") the next day.

WFA filed a claim in this case for an unsecured debt in the amount of $451,412.99, based on four promissory notes (the "Notes"). Motion to Dismiss, pp. 1-2; Claim No. 8-1. Between the fall of 2013 and the spring of 2015, Debtor signed the Notes, identified as Exhibits A through D in the Motion to Dismiss.[1] Motion to Dismiss, pp. 1-2; Exs. A, B, C, D. The Notes were the basis of a compensation structure that WFA presented to Debtor at the outset of Debtor's employment with WFA. WFA's Reply, p. 3; see also Offer Summary, Ex. 5.[2] The proceeds from the Notes were given to Debtor as financial bonuses for employment with WFA, including "transition," "asset," and "performance" bonuses. WFA's Reply, pp. 3-4; Ex. 5. Under this compensation structure, Debtor was able to collect the total amount of the funds assessed as bonuses upon the signing of a Note, with the monthly payments due on the

---

[1] WFA attached its Proof of Claim [Claim No. 8] to the Motion to Dismiss as "Exhibit A," but also attached the Notes with exhibit stickers listing the Notes as Exhibits A through D. For the purposes of this Order, the Court will consider the first of four Notes as "Exhibit A."

[2] The numbered exhibits in this Order refer to the exhibits contained in the trial binder jointly submitted by the parties and admitted into evidence at the October 10, 2017, hearing.

Notes to be deducted periodically from Debtor's income. WFA's Reply, pp. 4-5; Ex. 5.

Debtor began his employment with WFA on November 1, 2013, at its Greensboro office as Financial Advisor and Vice President – Investments/Investment Officer. Ex. 5, p. 1. Upon joining WFA, Debtor became eligible to receive a transition bonus of $263,877, along with future contingent eligibility to receive annual asset and performance bonuses of $94,242 each, based upon Debtor's total gross revenue. Id. at 1-3; see also Motion to Dismiss, pp. 1-2; Exs. A–D.[3] Each time Debtor signed a Note, WFA advanced the full amount of the bonus to him. After just over a year and a half of employment with WFA, Debtor resigned from his position. See Resignation Letter, Ex. 17. On the same day, WFA sent to Debtor a Notice of Demand, stating that, due to the termination of his employment at WFA, the Notes were due immediately. See Notice of Demand, Ex. 18. At that time, Debtor and WFA's representatives engaged in some negotiations regarding the payment of the balance of the Notes, but were unable to reach an agreement. See Email Exchange, Ex. 22. In June of 2016, WFA initiated an arbitration proceeding against Debtor by filing a Statement of Claim with the Financial Industry Regulatory Authority ("FINRA"). Motion to Dismiss, p.

---

[3] The first Note was the transition bonus; the remaining three Notes were asset and performance bonuses. Exs. A–D.

2.  The FINRA arbitration was pending as of the Petition Date, and was stayed with the filing of the Petition.

In the Motion to Dismiss, WFA moves the Court to dismiss this case for cause pursuant to 11 U.S.C. § 707(a) or, in the alternative, to convert the case to one under Chapter 11 pursuant to § 706.  Motion to Dismiss, pp. 1, 5.  WFA argues that Debtor's singling out WFA's debt for discharge, failure to make lifestyle adjustments or otherwise reduce expenses, and use of chapter 7 to keep a significant amount of assets while "walking away" from his debts constitutes a lack of good faith in the filing of the Petition that warrants dismissal.  Id. at 2-5.  Debtor contends in response that his principal purpose for seeking bankruptcy relief was to avoid a protracted and costly arbitration proceeding.  Debtor's Response, p. 1.  Despite his education and training as a financial advisor, his acceptance in full of the proceeds of the Notes, and the clear terms of the Notes, Debtor disputes his liability on the Notes, claiming that WFA misrepresented the terms of his employment, enticed Debtor to leave his prior employment to work for WFA, and ultimately obtained Debtor's signature on the Notes through fraudulent inducement.  Id. at 2-3.  Regardless of the validity of the Notes, the Debtor argues that WFA has mischaracterized the assets of the estate and Debtor's financial standing by drawing inferences out of context.  Id. at 5.

## II.  Jurisdiction and Authority

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. § 1334 as a matter arising under title 11.  Under 11 U.S.C. § 157(a), the United States District Court for the Middle District of North Carolina has referred this case and this proceeding to this Court by its Local Rule 83.11.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F), in which this Court has statutory and constitutional authority to enter final judgments.

## III. Discussion

Under Section 707(a), a court may dismiss a chapter 7 case after notice and a hearing for cause.  11 U.S.C. § 707(a). Section 707(a) does not define "cause," but provides three non-exhaustive examples:

> (1) unreasonable delay by the debtor that is prejudicial to creditors; (2) nonpayment of any fees or charges required under chapter 123 of title 28; and (3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a), but only on a motion by the United States trustee.

Id.  Cause for dismissal under this section includes a lack of good faith in the filing of the petition.  See In re Stancil, No. 12-08950-8-SWH, 2014 WL 335349, at *3 (Bankr. E.D.N.C. Jan. 30, 2014); In re Gilman, No. 11-06036-8-SWH, 2012 WL 1230276, at *2 (Bankr. E.D.N.C. Apr. 12, 2012) (citing cases).  A debtor's

bad faith acts or omissions that constitute a misuse or abuse of the provisions, purpose, or spirit of the Bankruptcy Code may constitute cause for dismissal.  <u>McDow v. Smith</u>, 295 B.R. 69, 74-75 (E.D. Va. 2003).

To determine the presence of bad faith or the absence of good faith under section 707(a), courts both in and out of the Fourth Circuit have assembled and adopted a non-exclusive, totality of the circumstances test.  <u>See, e.g.</u>, <u>In re Marino</u>, 388 B.R. 679 (Bankr. E.D.N.C. 2008); <u>In re Keobapha</u> 279 B.R. 49 (Bankr. D.Conn. 2002).  The fourteen factors these courts consider include:

1.   The debtor reduces creditors to a single creditor in the months prior to the filing of the petition;

2.   The debtor failed to make lifestyle adjustments or continued living an expansive or lavish lifestyle;

3.   Debtor filed the case in response to a Judgment[or] pending litigation ...;[4]

4.   The debtor made no efforts to repay his debts;

5.   The unfairness of the use of Chapter 7;

6.   The debtor has sufficient resources to pay his debts;

7.   The debtor is paying debts to insiders;

---

[4] This factor is more clearly stated as: "[T]he debtor filed the case in response to a judgment, pending litigation, or a collection action . . . ." <u>See</u> <u>e.g.</u>, <u>In re Piazza</u>, 451 B.R. 608, 615 (Bankr. S.D. Fla. 2011) (quoting <u>In re Baird</u>, 456 B.R. 112, 116-17 (Bankr. M.D. Fla. 2010)).

8.    The  schedules  inflate  expenses  to  disguise financial well-being;

9.  The debtor transferred assets;

10.   The debtor's overly utilizing the protections of the Code to the unconscionable detriment of creditors;

11.   The debtor employed a deliberate and persistent plan of evading a single major creditor;

12.   The  debtor  failed  to  make  candid  and  full disclosure;

13.   The debts are modest in relation to assets and income; and

14.    There  are  multiple  bankruptcies  or  other procedural "gymnastics."

Marino, 388 B.R. at 682 (citations omitted).

Courts use these factors as guidelines, applying them as needed to the facts at hand.  While the presence of any single factor likely will not be sufficient for a finding of bad faith, the presence of multiple factors, when taken together, may suffice.  See Stancil, 2014 WL 339345, at *3 (citing In re Scott, No. 10-000794-8-JRL, at 7 (Bankr. E.D.N.C. Aug. 6, 2010)).  Here, considering the totality of the circumstances, there is cause to dismiss Debtor's case.  Applying these factors, the totality of circumstances in this case requires dismissal.

**A. The debtor essentially is attempting to discharge a single creditor**

This case is essentially a two-party dispute between Debtor and WFA.  Of the $506,144.20 nonpriority unsecured debt Debtor scheduled on his petition, WFA held $500,000.  See Petition, pp. 8, 32.  At the hearing, the Debtor testified that, prior to filing the Petition, he was making payments "most of the time" on an American Express credit account that constituted approximately $4,000 of the remaining unsecured debt.  See Audio Transcript of October 10, 2017, Hearing [Doc. #88] ("Audio Transcript") at 1:47:00.  WFA argues that Debtor's paying down other debts while attempting to discharge WFA's entire claim amounts to unfair and preferential treatment of its claim and evidences Debtor's motive of singling out WFA's debt as the reason Debtor filed for chapter 7 relief.  Debtor counters that this factor does not apply in this case because he did not "reduce" or otherwise manipulate his creditors into a single creditor in the months leading up to the petition.

The United States Bankruptcy Court for the Eastern District of North Carolina recently rejected a similar counter argument. In In re Edwards, the creditor contended, inter alia, that there was cause to dismiss the debtor's chapter 7 case because "the filing appear[ed] to be directed toward discharging two large business debts . . . (totaling 71% of the scheduled debt)."  No.

16-06436-5-SWH, 2017 WL 3616582, at *3 (Bankr. E.D.N.C. Oct. 3, 2017).   The debtor denied this contention.   Id. at *4.   The court construed this factor to include "manipulation or preferential treatment of other creditors to the detriment of one[,]" and found cause to dismiss where the debtors did not reduce creditors or consolidate debts prior to the petition date, but pledged significant financial support to a relative and increased their charitable contributions post-petition, in lieu of repayment of dischargeable debts.   Id.   Courts appropriately consider whether a single creditor makes up the vast majority of the liabilities the debtor seeks to discharge.   See, e.g., In re Griffieth, 209 B.R. 823, 829 (Bankr. N.D.N.Y. 1996).   If a single creditor represents the vast majority of the debt sought to be discharged, a court may construe the purpose of the debtor's filing a petition to be the "singling out" of a major creditor in order to avoid payment of that debt.   Id.   In addition to other factors also present in this case, the court in Griffieth dismissed the case for bad faith, finding that the purpose of the filing in its case was primarily to discharge a single debt to the IRS.   Id.

     Here, Debtor openly admits that this case was filed solely to avoid the arbitration with WFA and to discharge that debt, which makes up approximately 99% of his total scheduled debt. Debtor filed the Petition nearly two years after leaving WFA.

9

In the interim, Debtor continued to make payments on various mortgages and at least one credit card, but simultaneously made no payments whatsoever on his obligations to WFA and continued to dispute any liability to WFA based on a contention that WFA fraudulently induced Debtor to sign the Notes. Though Debtor and WFA attempted to resolve this issue through negotiations in the fall of 2015, the parties were unable to reach an agreement. See Ex. 22. To date, Debtor has not made any payments to WFA on the Notes since his termination and continues to dispute the validity of the debt in the pending arbitration and in his filings with this Court. See Debtor's Response, p. 3. There is nothing in the record to indicate that Debtor has contested any other secured or unsecured debts or otherwise ceased payments to any other creditor. Further, in response to the arbitration proceeding initiated to resolve the dispute on this particular debt, Debtor chose to file the Petition to stay the proceeding rather than engage in arbitration. More than two years after Debtor left WFA, the issue of the outstanding balance on the Notes remains unresolved while, by all indications, other aspects of Debtor's financial life have carried on as usual. Debtor's actions leading up to, and following, the Petition Date amount to preferential treatment of creditors to WFA's detriment. This factor weighs heavily in favor of dismissal.

10

### B. The debtor failed to make lifestyle adjustments or continued living an expansive or lavish lifestyle

Debtor has failed to make lifestyle adjustments in this case. Debtor's schedules reflect a combined monthly income of $18,546.71 and monthly expenses of $18,242.54. Petition, pp. 37-40. Debtor owns multiple real properties, including two rental properties. Id. at 10-12. Debtor testified at the hearing that neither of the rental properties were currently generating income, and had only been sporadically rented to tenants that often did not pay rent regularly and, in one case, caused significant damage to the property. Audio Transcript, 45:00, 1:38:40. Debtor's Schedule J reflects a monthly expense in the amount of $1,000 for "Miscellaneous Expenses on Rentals." Petition, p. 40. Debtor testified that one of the real properties, 2910 Cromwell Road, required approximately $15,000 to $20,000 in repairs, but it was unclear whether any of the repairs had been made or paid for and, if so, whether the scheduled $1,000 per month in rental expenses was an accurate reflection of the cost of such repairs. Audio Transcript, 1:42:00. In addition to the two rental properties in Greensboro, Debtor owns a small beach house located at 271 Sam Allen Road in Roper, NC, which is used exclusively by Debtor and his family, with the exception of a one month short-term rental to a tenant in the fall of 2016. Id. This beach house

generates no other income, and Debtor made no showing that he attempted to rent or sell the property to further his chapter 7 liquidation. Each of the properties is subject to outstanding mortgages, for which the monthly payments on all Debtor's real property obligations total $2,603.03. Petition, pp. 39-40.

In addition to his real properties, Debtor also owns six vehicles. Id. at 13-14. One of the vehicles is an inoperable, older model with high mileage, and two of the vehicles are Debtor's sons' primary vehicles. Moreover, approximately one month before filing the petition, and after WFA had initiated an arbitration proceeding against him, Debtor traded in his ownership interest in his 2013 Chevrolet Tahoe to lease a 2017 model. Audio Transcript, 1:45:30. Debtor testified at the hearing, consistent with the information on Schedule J, that he continues to make payments of $421 per month towards the new lease. Id.; Petition, p. 40. In Edwards, the debtors similarly traded in a late-model model vehicle to purchase two newer vehicles. See Edwards, 2017 WL 3616582 at *4. The court acknowledged that those vehicles "were purchased for valid reasons (safety features)[,]" but nevertheless found that the purchase of the vehicles could not be viewed outside the context of the amount of unpaid liabilities the debtors sought to discharge. Id. Here, Debtor did not demonstrate any valid reasons for trading in a 2013 model year vehicle, in which he

12

had at least $14,154.27 in equity, to lease a brand new model of the same make.  See Petition, p. 47.[5]

Debtor's monthly expenses include $4,153.03 for Debtor's various mortgages and real property maintenance and repair costs, $1,000 for food and housekeeping supplies, $2,000 for childcare and education costs, $1,000 for entertainment, and $1,421 for transportation and monthly payments on vehicles.  Id. at 39-40.  Without regard to whether these expenses are "lavish," they are certainly "expansive."  In In re Gilman, the court determined that the debtors' monthly expenses of approximately $17,500, including significant expenditures on food and children's costs, were "significant indicia of an excessive lifestyle," and weighed in favor of finding cause to dismiss.  No. 11-06036-8-SWH, 2012 WL 1230276, at *4 (Bankr. E.D.N.C. Apr. 12, 2012).  Though the Bankruptcy Code does not expressly require debtors to change their lifestyle upon filing, a debtor's lifestyle and expenses plainly are a factor to be considered under section 707(a).  See Id. (citing McDow, 295 B.R. at 80).  Instead of reducing his expenses post-petition, Debtor appears to have fully preserved the lifestyle he had prior to filing for bankruptcy.  The protections of the Code were not intended to assist debtors in preserving expansive

---

[5] This transfer not only indicates an expansive lifestyle, but also reduced the assets available for execution by WFA.  See Section III, D., infra.

lifestyles to the detriment of their creditors.  Gilman, 2012 WL 1230276, at *4.

Debtor urges the Court to follow the Third Circuit's reasoning in Perlin v. Hitachi Capital America Corp. wherein the court held that a bankruptcy court's good faith determination is "not without limitations" and cautioned that dismissal under § 707(a) should be used only in "egregious cases."  497 F.3d 364, 373 (3d Cir. 2007) (quoting In re Tamecki, 229 F.3d 205, 208 (3d Cir. 2000)).  The court in Perlin affirmed the lower court's denial of a motion to dismiss because the debtors' excessive income and expenses, without other indications of bad faith, could not rise to the level of "cause" sufficient to warrant dismissal.  Id. at 375; see also id. at 374 ("[A] bankruptcy court's ultimate finding of bad faith may not be based exclusively or primarily on a debtor's substantial financial means.").  Perlin does not stand for the proposition that substantial incomes and excessive expenses cannot be considered at all in weighing a motion to dismiss under § 707(a).  On the contrary, the court specifically recognized that courts should consider these factors.  Id. at 372 ("While the legislative history makes clear that a debtor's ability to repay his debts is inadequate cause for dismissal, we do not read the history as prohibiting a bankruptcy court from considering a debtor's substantial income and expenses in determining whether the

14

debtor filed his bankruptcy petition in good faith."). Here, the case for Debtor's dismissal does not rest solely on the shoulders of his financial means. Though Debtor's substantial income and expenses weigh in favor of dismissal, so do a number of the additional delineated factors in the applicable totality of the circumstances test. Given the circumstances surrounding Debtor's real properties, vehicles, and monthly expenses, this factor also weighs heavily in favor of dismissal.

**C. The debtor has sufficient resources to pay his debts**

Debtor's financial circumstances establish that he has sufficient resources to pay a sizeable portion of the debt owed to WFA. In the Motion to Dismiss and at the hearing, WFA raised concerns regarding certain of Debtor's expenses that could be reduced or removed, including without limitation his vehicles, real estate expenses, and the cost of his son's tuition. See Motion to Dismiss, p. 3; Audio Transcript, 1:54:00. On Schedule J, Debtor listed a monthly expense of $2,000 on line 8 – childcare and children's education costs. Petition, p. 40. At the hearing Debtor confirmed that this expense was the tuition cost for his son to attend college. Audio Transcript, 1:58:00. Debtor has paid and continues to pay the full price of tuition, fees, and expenses for his son because his son has neither received any academic or athletic scholarships, nor applied for any federal or private financial aid. Id. Supporting a child's

higher education is laudable, but the decision to do so must be considered within the context of the discharge he seeks in this chapter 7 case.    The fact that Debtor spends thousands of dollars a year on an undergraduate education suggests Debtor has sufficient resources to pay his debts, but that he has chosen to allocate those resources elsewhere.    Were Debtor to receive a discharge under these circumstances, it would essentially place the cost of his son's college education on his unsecured creditors, i.e., WFA.    WFA argues, and the Court agrees, that such a result is inequitable and does not further the purposes of the Bankruptcy Code.    Debtor earns over $18,000 every month in income working as a financial advisor, owns three real properties excluding his own residence, owns six vehicles including two operated predominantly by his children, and has fully funded both his sons' college educations, while not repaying his creditors.    Debtor's assets, coupled with Debtor's expenses, notably his contribution to his sons' education, establish that Debtor has the ability to pay his debts.    This factor weighs heavily in favor of dismissal.

### D.   The debtor transferred assets

As of the Petition Date, Debtor owned 2910 Cromwell Road, Greensboro, NC as a tenancy by the entirety with his spouse. Audio Transcript, 11:00.    Debtor inherited this property from his parents in 2005.    Id.    The property was titled solely in

16

Debtor's name until Debtor deeded the property to himself and his spouse in October 2015, one month following the breakdown of negotiations between Debtor and WFA for repayment of the Notes. Id. at 12:00.  Debtor testified at the hearing that the property was transferred after meeting with an estate planner for the purpose of creating a will, but offered no other explanation why this was necessary.  Id.

If unavoidable, this transfer potentially shielded the real property from WFA.  "[R]eal property owned as tenants by the entirety in North Carolina is not subject to a claim by a creditor against only one spouse."  In re Knapp, 285 B.R. 176, 179 (Bankr. M.D.N.C. 2002) (citing Grabenhofer v. Garrett, 260 N.C. 118, 120, 131 S.E.2d 675, 677 (1963)).  Cause for dismissal may exist in cases where a debtor "commit[s] fraudulent acts at the expense of his creditors, such as transferring significant assets beyond their reach."  McDow, 259 B.R. at 80 (citing In re Marks, 174 B.R. 37, 41 (E.D. Pa. 1994) ("Most instances of dismissal for bad faith filing under § 707(a) involve . . . unexplained transfers to place assets beyond the reach of creditors.")); see also In re Brown, 88 B.R. 280 (Bankr. D. Haw. 1988) (dismissing a case under § 707(a) for a lack of good faith where the debtor transferred substantially all of the profits from his medical practice to himself and his wife as tenants by the entireties in an effort to avoid paying anything to the sole

17

creditor).  Here, the transfer of 2910 Cromwell Road had the
effect of shielding this property from any judgment obtained by
WFA, as WFA's claim under the Notes is solely against Debtor.
This factor also weighs in favor of dismissal.

> **E.  Debtor filed the case in response to pending
> litigation**

Debtor does not dispute that he filed this case in response
to WFA's arbitration proceeding.  Audio Transcript, 18:30.  In
Debtor's Response, Debtor stated that he anticipated the
arbitration would cost him over $100,000 in legal fees.
Debtor's Response, p. 1.  Debtor also confirmed this expected
expense through his testimony at the hearing and stated that the
arbitration was "extremely" time-consuming.  Audio Transcript,
19:00.  However, Debtor also testified that the only documents
filed on his behalf in the arbitration were an answer and
counterclaim, and that he had spent approximately $10,000 on
representation.  Id. at 39:00.  In Edwards, the court granted a
motion to dismiss, partly in consideration of the fact that
creditors had sent the debtors demand letters indicating
litigation may be forthcoming, although no lawsuits had been
filed as of the petition date.  Edwards, 2017 WL 3616582 at *5.
The debtors in Edwards chose to file for bankruptcy in lieu of
attempting to resolve the debts.  Id.  The court determined that
this indicated bad faith.  Id.  In the instant case, the threat

18

of litigation was well past demand letters.  WFA commenced the
FINRA arbitration proceeding to enforce its rights under the
Notes prior to the Petition Date.  At the hearing, when asked
why he filed for chapter 7, Debtor responded that "there was no
other way to resolve the situation" and that he needed to "try
to reach a resolution and bring an end to the litigation with
Wells Fargo Advisers."  Audio Transcript, 5:30.  Though the
parties dispute each other's willingness to continue
negotiations, and Debtor argued in closing that he was not
attempting to avoid litigation with WFA, it is uncontested that
Debtor filed the Petition in response to the pending arbitration
with WFA and WFA's other attempts to collect under the Notes.

**F.   The debtor made no efforts to repay his debt to
WFA**

After Debtor terminated his employment with WFA, Debtor and
WFA engaged in negotiations regarding payment of the outstanding
balance of the Notes.  See Ex. 22.  These negotiations did not
result in an agreement between the parties on the amount to be
repaid or any payment schedule, and WFA commenced the
arbitration proceeding as a result.  At the hearing, Debtor
argued that he asked WFA to continue to work with him on finding
a compromise acceptable to both sides but that WFA was unwilling
to cooperate.  In contrast, WFA argued it was in fact Debtor who
was not participating in good faith to resolve the dispute.

19

Regardless of the status of negotiations, WFA contends the pending arbitration is the proper mechanism to reach a resolution of the issues surrounding the Notes, but instead Debtor has chosen to seek a discharge of the entire debt rather than substantively participate in the arbitration process. Both parties claim they were open to further negotiation outside of formal court proceedings, but simultaneously claim it was the other party who stymied such efforts. In any event, Debtor did not present any evidence of efforts to repay the WFA obligations, and this factor therefore weighs in favor of dismissal.

### G. The totality of circumstances standard requires dismissal

The Court did not find Debtor's testimony at the hearing credible. In particular, the Court found it implausible that this Debtor, as a financial planner, did not read or understand the terms of the Notes that he signed in exchange for the receipt of over one half million dollars. The Eastern District of North Carolina has noted that the fourteen-factor, totality of the circumstances analysis is akin to the "smell test" employed by the Sixth Circuit in Indus. Ins. Servs., Inc. v. Zick (In re Zick), 931 F.2d 1124, 1127 (6th Cir. 1991). See Edwards, 2014 WL 3616582 at *4. In upholding the bankruptcy court's decision to dismiss the Zick case, the Sixth Circuit

found that a court could consider, <u>inter</u> <u>alia</u>, the debtor's failure to make significant lifestyle adjustments, that the petition was filed in response to a mediation award, and the general unfairness of the use of chapter 7 relief under the particular circumstances in the case to warrant dismissal under Section 707(a). <u>See</u> <u>Zick</u>, 931 F.2d at 1127-28. For the reasons discussed above, the instant case does not survive the "smell test." Upon review of the relevant factors, and in consideration of the totality of the circumstances, the Court finds sufficient cause exists to dismiss this case for bad faith under Section 707(a).

**IV.**  **Conclusion**

For the reasons set forth above, the Court will enter an order granting WFA's Motion to Dismiss.

[End of Document]

21

## <u>Parties To Be Served</u>

**Ronald Arthur Woody**
4003 Waldenbrook Court
Greensboro, NC 27407

**Charles M. Ivey, III**
Ivey, McClellan, Gatton, & Siegmund, LLP
Suite 500
100 S. Elm St.
Greensboro, NC 27401

**William P. Miller**
Bankruptcy Administrator
101 S. Edgeworth St.
Greensboro, NC 27401

**Everett B. Saslow, Jr.**
P.O. Box 989
Greensboro, NC 27402

**William H. Kroll**
9208 Falls of Neuse Road, Suite 201
Raleigh, NC 27615

**Paul J. Puryear**
4101 Lake Boone Trail, Suite 300
Raleigh, NC 27607